**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**(Roanoke Division)**

JORDAN PEYTON,

Plaintiff,

v. Civil Action No. 7:23-cv-00209-MFU

KARL KUHN

Defendant.

# PLAINTIFF PEYTON'S RESPONSE IN OPPOSITION TO DEFENDANT KUHN'S MOTION FOR SUMMARY JUDGMENT

Lindsay R. McKasson, VSB No. 96074
Benjamin North, VSB No. 97439
Jared J. Roberts, VSB No. 97192
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
lindsay@binnall.com
ben@binnall.com
jared@binnall.com

Aaron B. Houchens, VSB No. 80489
AARON B. HOUCHENS, P.C.
111 East Main Street
P.O. Box 1250
Salem, Virginia 24153
Phone: 540-389-4498
aaron@houchenslaw.com

*Counsel for Plaintiff Jordan Peyton*

# TABLE OF CONTENTS


TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

STATEMENT OF DISPUTED MATERIAL FACTS .......... 1

A. Mr. Peyton's Recruitment and Commitment to Radford University. .......... 1
B. Mr. Peyton's Arrival at Radford and Early Issues with Defendant. .......... 1
C. Mr. Peyton's Mental Health Disclosure and Defendant's Retaliation. .......... 2
D. Player Complaints and Defendant's Continued Retaliation. .......... 3
E. Defendant's Pattern of Racialized Misconduct. .......... 6

STANDARD OF REVIEW .......... 7

ARGUMENT .......... 7

I. Defendant Kuhn is not entitled to sovereign immunity. .......... 7

A. This case was never a true "official capacity" case, a necessary prerequisite for any form of sovereign immunity. .......... 8
B. Even if this case is an "official capacity" case, Defendant waived sovereign immunity by waiting until the eleventh hour to assert it. .......... 12
C. Even if Kuhn did not waive sovereign immunity, there are elements of prospective relief that survive under *Ex parte Young*. .......... 13

II. There are Genuine Issues of Disputed Material Facts as to Whether Defendant Retaliated Against Mr. Peyton for Exercising his First Amendment Rights .......... 16

A. Defendant retaliated against Mr. Peyton by playing him in the game. .......... 17
B. Defendant retaliated against Mr. Peyton by cutting him from the team. .......... 19

CONCLUSION .......... 21

CERTIFICATE OF SERVICE .......... 23

## TABLE OF AUTHORITIES

### Cases

*Alden v. Maine*,
527 U.S. 706, 740-756 (1999) .......... 9

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 255 (1986) .......... 7

*Barnett v. Roanoke Cnty. Sch. Bd.*,
No. 7:20-cv-00663, 2021 WL 5611317, at *12 (W.D. Va. Nov. 30, 2021) .......... 20

*Bragg v. W. Virginia Coal Ass'n*,
248 F.3d 275, 292 (4th Cir. 2001) .......... 14

*Brandon v. Holt*,
469 U.S. 464, 471–472 (1985) .......... 8

*Brown v. Dep't of Pub. Safety & Corr. Servs.*,
383 F. Supp. 3d 519, 553 (D. Md. 2019) .......... 12

*Buxton v. Kurtinitis*,
862 F.3d 423, 427 (4th Cir. 2017) .......... 16

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474, 491 (4th Cir. 2005) .......... 12, 17

*Croley v. Matson Navigation Company*,
434 F.2d 73, 77 (5th Cir. 1970), Petition for rehearing denied 439 F.2d 788 (1971) .......... 7

*Denny v. Seaboard Lacquer, Inc.*,
487 F.2d 485, 491 (4th Cir. 1973) .......... 7

*Ex parte Young*,
209 U.S. 123 (1908) .......... 13, 14, 15

*Flanagan v. Scearce*,
No. 7:19-cv-00413, 2021 WL 4312555, at *8 (W.D. Va. Sept. 22, 2021) .......... 18, 19

*Haynes v. Waste Connections, Inc.*,
922 F.3d 219, 225 (4th Cir. 2019) .......... 20

*Hening v. Adair*,
644 F. Supp. 3d 203 (W.D. Va. 2022) .......... 19, 20, 21

*Hixson v. Moran*,
1 F.4th 297 (4th Cir. 2021) .......... 7
*Idaho v. Coeur d'Alene Tribe of Idaho*,
521 U.S. 261, 270 (1997) .......... 9

*Kentucky v. Graham*,
473 U.S. 159, 165-170 (1985) .......... 8, 9, 11, 15

*Lapides v. Bd. of Regents of Univ. Sys. of Georgia*,
535 U.S. 613, 618-619 (2002) .......... 12

*M.B. v. Fairfax Cnty. Sch. Bd.*,
660 F. Supp. 3d 508, 526 (E.D. Va. 2023) .......... 14

*Martin v. Duffy*,
977 F.3d 294, 299 (4th Cir. 2020) .......... 16

*Morrison v. Nissan Co.*,
601 F.2d 139, 141 (4th Cir. 1979) .......... 7

*Nair v. Oakland Cnty. Cmty. Mental Health Auth.*,
443 F.3d 469, 476 (6th Cir. 2006) .......... 12

*Penley v. McDowell Cnty. Bd. of Educ.*,
876 F.3d 646, 656 (4th Cir. 2017) .......... 18

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89, 141-143 (1984) (Stevens, J., dissenting) .......... 9

*Peyton v. Kuhn*,
No. 7:23-cv-209, 2023 WL 8374930, at *2 (W.D. Va. Dec. 4, 2023) .......... 16

*Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine*,
486 F. Supp. 3d 1173, 1188 (S.D. Ohio 2020) .......... 13

*Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*,
506 U.S. 139, 144 (1993) .......... 13

*Schmidt v. McKay,*
555 F.2d 30, 37 (2d Cir. 1977) .......... 7

*Shaw v. Foreman*,
59 F.4th 121, 130 (4th Cir. 2023) .......... 16

*Shaw v. Stroud*,
13 F.3d 791, 798 (4th Cir. 1994) .......... 7

*Stewart v. Nottoway Cnty.*,
684 F. Supp. 3d 467, 477 (E.D. Va. 2023) .......... 10

*Talley v. Folwell*,
133 F.4th 289, 298 (4th Cir. 2025) .......... 14

*United States v. Williams*,
445 F.3d 724, 736 n.6 (4th Cir. 2006) .......... 14

*Wis. Dep't of Corr. v. Schacht*,
524 U.S. 381, 394-95 (1998) (Kennedy, J., concurring) .......... 13

**Statutes**

42 U.S.C. § 1983 .......... 8

**Rules**

Fed. R. Civ. P. 25(d) .......... 10

Fed. R. Civ. P. 34 .......... 11

Fed. R. Civ. P. 56(a) .......... 7

Defendant Kuhn retaliated against Mr. Peyton for his exercise of free speech. As litigation nears its conclusion, Defendant Kuhn raises sovereign immunity as a defense for the first time. This defense, like his meritless defenses on the substance of Mr. Peyton's First Amendment claim, fails because sovereign immunity is inapplicable or waived because it was not previously raised. His modest defenses on the merits of the First Amendment claim likewise fail because it is clear that a reasonable jury could find him liable for retaliation. The Court should deny the motion, allowing Mr. Peyton a trial on the merits.

## STATEMENT OF DISPUTED MATERIAL FACTS

### A. Mr. Peyton's Recruitment and Commitment to Radford University.

Plaintiff Jordan Peyton committed to play baseball at Radford University in 2018, prior to his junior year of high school. Exhibit A, Peyton Dep. 10:11–17. In high school, Mr. Peyton played second base, shortstop, outfield, and pitcher. *Id.* at 11:9–15. Mr. Peyton was regarded as a highly sought-after baseball recruit, even Major League Baseball Hall of Fame pitcher Billy Wagner praised Mr. Peyton's skill and ability. Exhibit F. When Mr. Peyton initially committed to Radford, the baseball team was coached by Joe Raccuia. Exhibit A at 11:23–12:5. In August 2019, however, Radford hired Defendant Kuhn as its new head baseball coach. Exhibit B, Kuhn Dep. 10:20–22. Following Defendant's hiring, he personally called Mr. Peyton to inform him that he still wanted him to join the team. Exhibit A at 14:1–10. In November 2019, during Mr. Peyton's senior year of high school, Defendant issued a written scholarship offer to Mr. Peyton to play baseball at Radford. Exhibit B at 37:4–11. Mr. Peyton's scholarship was for a "top five" scholarship on the team, indicating Radford's (and Defendant's) desire to keep Mr. Peyton's commitment to play. Exhibit A at 17:13–18:4.

### B. Mr. Peyton's Arrival at Radford and Early Issues with Defendant.

When Mr. Peyton arrived on campus in fall 2020, he immediately began noticing problems under Defendant's leadership. He observed that all African American players, including himself, were

grouped together in the team locker room. Exhibit A at 20:13–22:16. Radford later conducted an internal investigation into the matter and confirmed that minority players were, in fact, grouped together. Exhibit C, Durand Dep. 17:11–18:10.

Shortly thereafter, Defendant instructed the team that all players must stand for the national anthem. Exhibit A at 23:14–24:18. This directive occurred during the semester immediately following George Floyd's murder, and Mr. Peyton found the directive deeply inappropriate. *Id.* During the same semester, in September 2020, Radford hosted the "Bigger Picture March"—a peaceful, university-sponsored rally related to racial justice issues. Exhibit D, Lineburg Dep. 37:20–38:4. Defendant informed the baseball team, however, that they were not permitted to attend. Exhibit G.

Mr. Peyton chose to exercise his First Amendment rights to attend the march. Exhibit A at 30:10–17. Notably, Radford's Athletic Director, Robert Lineburg, also attended the march and walked with the volleyball team. Exhibit D at 37:20–38:16. As Mr. Lineburg testified, all student-athletes should have been allowed to attend. *Id.*

From the outset of his time at Radford, it was apparent to Mr. Peyton that Defendant harbored a bias against him. And, because it was clear Defendant would not provide Mr. Peyton with any playing time that season, Mr. Peyton thought as early as early fall of that year that he would likely need to redshirt for the season, but did not intend to leave the team. Exhibit A at 16:7–20.[1]

### C. Mr. Peyton's Mental Health Disclosure and Defendant's Retaliation.

Later his freshman year, in March 2021, Mr. Peyton approached Defendant to discuss his anxiety and depression. Exhibit A at 31:14–33:1. Mr. Peyton felt bullied by Defendant throughout the fall semester and into the spring, which negatively impacted his mental health. Exhibit E, McCoy Dep.

---

[1] "Redshirting" in baseball means that a player does not appear in any games during the season, thereby preserving that year of NCAA eligibility. Exhibit C at 46:21–47:6.

15:5–16. Rather than offering assistance or support, Defendant insensitively told Mr. Peyton that if he ever felt like he needed to cut his head off with scissors, he could come to him. Exhibit A at 31:14–33:1. Deeply disturbed, Mr. Peyton reported the comment to Allison McCoy, Radford's then Assistant Athletic Director for Student-Athlete Support Services. *Id.*; Exhibit E at 16:12–17:11. Mr. Lineburg agreed that such a statement is highly inappropriate. Exhibit D at 17:21–18:13.

Approximately one week after Mr. Peyton reported the "scissors comment," Defendant called him and interrogated him with a series of cornered questions about the report. Exhibit A at 31:14–33:1. Shortly thereafter, Defendant began excluding Mr. Peyton from travel opportunities with the team and withdrew certain practice privileges. *Id.* at 34:18–35:2. Defendant admitted that there came a time when he no longer allowed Mr. Peyton to travel with the team. Exhibit B at 76:16–78:11.

Ultimately, Mr. Peyton and Defendant appeared to reach an understanding that Mr. Peyton would redshirt that season. Exhibit A at 34:18–35:2. Ms. McCoy also encouraged Mr. Peyton to redshirt, noting it was common for players intending to redshirt to remain active members of the team. Exhibit E at 36:19–37:15, 53:8–11.

Mr. Peyton attempted one final time to get playing time in March 2021, because he did not want to quit and wanted to compete. Exhibit A at 66:2–19. Defendant, however, told Mr. Peyton he could not play because he was not on the active roster. *Id.* Cory Durand, the Deputy Athletics Director, however, testified that Mr. Peyton was indeed on the active roster. Exhibit C at 20:22–25. In fact, Mr. Durand's own notes in March 2021 note that Defendant told Mr. Peyton he was part of the future of Radford baseball. Exhibit H. Mr. Durand had a keen insight into the baseball team as the person in charge of oversight of the team. Exhibit C at 11:24–12:4.

### D. Player Complaints and Defendant's Continued Retaliation.

Over a month later, on April 21, 2021, as issues persisted, Mr. Peyton and twelve other players met with Deputy Athletics Director Cory Durand and Compliance Director Malinda Tassler to voice

their grievances about Defendant's conduct. Exhibit C at 23:4–21. Defendant quickly became aware of the meeting. Exhibit B at 47:17–21. Importantly, he knew Mr. Peyton had participated and viewed him as "one of the main figures" in bringing complaints to Radford. *Id.* at 63:21–64:7. Ms. McCoy also testified that Defendant viewed Mr. Peyton as the "ringleader." Exhibit E at 30:21–32:5.

Just two days later, on April 23, 2021, Defendant played Mr. Peyton in a game for the first time all season—despite the season being nearly over. Exhibit B at 17:16–24, 28:19–25. As head coach, Defendant fully understood the implications of redshirting—namely, that if an athlete played in any game, he would be ineligible to redshirt. *Id.* at 25:2–8.

Making it clearer that Defendant's choice to play Mr. Peyton was retaliatory is that it is irregular for a player to appear for the first time so late in the season. Exhibit A at 48:4–17. Before being forced to play by Defendant, Mr. Peyton assumed his redshirt was secure and had no prior notice that he would be playing. *Id.* at 48:10–49:2. Mr. Peyton did not learn he would be playing in the game until he arrived in the dugout and saw his name on the lineup card. *Id.* at 60:1–8. Mr. Peyton immediately texted his parents, stating that he did not have a choice on whether to play. Exhibit I.

Defendant knew that playing even one game could eliminate Mr. Peyton's redshirt eligibility. Exhibit B at 27:18–28:3; Exhibit A at 50:4–9. Nonetheless, Defendant played him—out of position at third base. Exhibit J. Playing Mr. Peyton out of position is another piece of evidence relating to the choice to play Mr. Peyton as retaliatory in nature. Defendant did not deny that there were potentially two other infielders who could have played third base instead of Mr. Peyton. Exhibit B at 70:18–72:5. Defendant testified he did not even consider playing another player in Peyton's place. *Id.* Despite the turmoil, Mr. Peyton performed well during the game. Exhibit J.

Indicating his anger over the complaints made against him, and during the game in which he chose to play Peyton, costing him his redshirt, Defendant approached the mound for a conference with all infielders, including Mr. Peyton, and stated, "Y'all thought y'all could get rid of me that easy,"

before walking away. Exhibit A at 44:19–45:6. Mr. Lineburg confirmed he heard reports of this comment. Exhibit D at 37:13–19. Defendant then subbed Mr. Peyton out of the game with only three innings remaining. Exhibit J.

Less than a week after the game, Defendant cut Mr. Peyton from the team—weeks before the season had concluded. Exhibit B at 30:6–21. Defendant took these actions even though, historically, Radford baseball waited until the season ended before releasing players. Exhibit D at 33:18–25. Following Mr. Peyton's dismissal, Defendant immediately added two new players from Radford's club baseball team (i.e. below the standards of the competitive team), which Mr. Lineburg found "unusual." *Id.* at 34:1–10.

Defendant later claimed he cut Mr. Peyton because he felt Radford was not the "right fit" for Mr. Peyton and claimed he believed Mr. Peyton would not receive enough playing time to remain satisfied. Exhibit B at 20:8–23:18. This excuse, however, ignored the facts of the situation; Mr. Durand and Mr. Lineburg testified that Mr. Peyton's concerns extended well beyond just playing time. Exhibit C at 16:7–10; Exhibit D at 54:10–13. Mr. Lineburg acknowledged that Defendant had a conflict with Mr. Peyton and that Mr. Peyton's reporting of the "scissors" comment contributed to that conflict. Exhibit D at 19:19–20:6.[2]

Ultimately, by playing Mr. Peyton, Defendant burned his redshirt, forcing Mr. Peyton to apply for an NCAA hardship waiver to regain his lost year of eligibility. Exhibit E at 39:22–24; Exhibit D at 33:5–7; Exhibit A at 52:16–53:12. Mr. Lineburg did not deny that Mr. Peyton's termination was retaliatory for his complaints. Exhibit D at 41:2–4.

---

[2] After being cut, Mr. Peyton obtained a scholarship from Towson, played baseball there for four years, and now plays professionally. Exhibit A at 53:1–15, 54:1–23, 62:22–63:6.

**E. Defendant's Pattern of Racialized Misconduct.**

The issues Mr. Peyton experienced were not isolated. Mr. Peyton, however, bared the brunt of the retaliation because Defendant viewed him as the leader of player complaints and targeted him accordingly. According to Mr. Durand, Radford baseball under Defendant became a "nightmare." Exhibit C at 31:12–32:6. There were reports that Defendant berated players privately, even taking them into bathrooms to avoid witnesses. *Id.* at 40:1–3; Exhibit D at 37:6–9. Defendant also engaged in racially and verbally abusive conduct. He nicknamed an Asian player "Kimchi." Exhibit E at 16:5–8. He called another player a "retard" who looks like he "drools." Exhibit K. Defendant negatively commented to another player about him listening to "thug" rap music and commented on his bleached hair and earrings. Exhibit L. As a result of ongoing issues, Radford began a Title IX investigation into Defendant for discrimination and harassment during the 2022 baseball season. Exhibit B at 81:16–20.

Mr. Durand testified that Defendant always had an excuse, but that a clear pattern of abusive conduct had emerged. Exhibit C at 35:21–36:10. Mr. Durand explained that Defendant initially excused his behavior by claiming the 2021 players were not his recruits, yet the complaints continued into 2022. *Id.* at 30:15–31:11. Of the thirteen players from the April 2021 meeting, only two remained the next season—both of whom felt Defendant held a grudge against them. *Id.* at 30:1–14. Players became afraid to speak up, fearing that if Defendant discovered their complaints, he would cut them off from communication, bench them, or humiliate them publicly. *Id.* at 28:1–16.

Shortly after the investigation into Defendant began, Defendant entered into a separation agreement with Radford and resigned from his position. Exhibit B at 81:12–82:24. As Mr. Durand testified, Defendant left Radford because of "incidents related to verbal, and mental abuse with athletes." Exhibit C at 12:20–22.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) permits a court to grant summary judgment to a party only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In resolving the motion, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment must be denied if "a reasonable jury could return a verdict for the nonmoving party." *Hixson v. Moran*, 1 F.4th 297 (4th Cir. 2021) (quoting *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (internal quotation marks omitted)).

Finally, "when the disposition of a case turns on a determination of intent, courts must be especially cautious in granting summary judgment," as "the resolution of that issue depends so much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination." *Morrison v. Nissan Co.*, 601 F.2d 139, 141 (4th Cir. 1979) (citing *Denny v. Seaboard Lacquer, Inc.,* 487 F.2d 485, 491 (4th Cir. 1973); *Schmidt v. McKay,* 555 F.2d 30, 37 (2d Cir. 1977); *Mutual Fund Investors v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir. 1977); *Croley v. Matson Navigation Company,* 434 F.2d 73, 77 (5th Cir. 1970), Petition for rehearing denied 439 F.2d 788 (1971)).

## ARGUMENT

### I. Defendant Kuhn is not entitled to sovereign immunity.

Defendant Kuhn spends most of his brief arguing, for the first time in this litigation, that he is not really the defendant; rather, in his view, the office of head baseball coach at Radford was sued and therefore that office is entitled to the Commonwealth's sovereign immunity. ECF No. 47 at 7-10. The problems with this new theory are threefold: (1) neither side has been litigating this case as if it was against the office at Radford, and upon closer examination the pleadings in the case reflect that

this is a case against Kuhn personally; (2) even if the Radford office is the true defendant, the Defendant has waived sovereign immunity by waiting until the eleventh hour to assert this theory; and (3) even if sovereign immunity applies and was not waived, there are surviving parts of prospective declaratory and injunctive relief that survive under the *Ex parte Young* exception. For any of these reasons, Defendant is wrong, and his motion should be denied as to sovereign immunity.

### A. This case was never a true "official capacity" case, a necessary prerequisite for any form of sovereign immunity.

In order to assess whether Defendant Kuhn personally is the true defendant (rather than the Radford office), a brief discussion of official capacity § 1983 claims is necessary. In its seminal decision, *Kentucky v. Graham*, the Supreme Court outlined the fundamental differences between personal capacity and official capacity actions. 473 U.S. 159, 165-170 (1985). Personal capacity suits "seek to impose personal liability upon a government official for actions he takes under color of state law." *Id.*, at 165; *see also* 42 U.S.C. § 1983 (creating a cause of action against any "person" why deprives another of federal constitutional rights under color of state law). "[A]n official in a personal-capacity action may, depending on his position, be able to assert personal immunity defenses, such as objectively reasonable reliance on existing law." *Kentucky*, 473 U.S. at 166-167.

Official capacity suits, by contrast, are suits against the government entity itself. Indeed, "[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471–472 (1985)). In case there was any doubt as to the real party at interest in an official capacity suit, the Supreme Court emphasized "[i]t is *not* a suit against the official personally, for the real party in interest is the entity." *Id.* (emphasis in original). The defenses are also entirely distinct from personal capacity suits—where an official in a personal capacity suit can assert personal

liability defenses, an entity defending an official capacity suit may only assert "forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment." *Id.*, at 167.

The key distinction between personal and official capacity suits, therefore, is the true "party at interest." *Id.* at 166. The true party at interest determines the defenses available, because the immunity defenses available to a private party and a government entity are mutually exclusive. Sovereign immunity, for example, may be asserted only by the sovereign and therefore is only available when the sovereign is a party to the suit. *Alden v. Maine*, 527 U.S. 706, 740-756 (1999) (only state entities can assert sovereign immunity as a defense); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 141-143 (1984) (Stevens, J., dissenting). Ultimately, the answer to whether the suit is a personal or official capacity one is not determined by "elementary mechanics of captions and pleading" *Alden*, 527 U.S. at 757 (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 270 (1997)); instead, is it determined by the identity of the true party at interest. *Kentucky*, 473 U.S. at 165-167.

In *Kentucky*, the Supreme Court held the plaintiff's action was "necessarily litigated as [solely] a personal-capacity action" even though the complaint listed the defendant as being sued in both his "individual" and "official" capacities and the state government was named directly as a defendant for the sole purpose of a fee award. 473 U.S. at 168. The Supreme Court reasoned that because monetary damages were never sought from the Commonwealth of Kentucky (only an award of fees which was held to be unconstitutional), the case had to be litigated as a personal capacity action consistent with the Eleventh Amendment. Similarly, in *Coeur d'Alene*, the Supreme Court held that even a personal capacity suit could not proceed on its claim of declaratory and injunctive relief if that relief would have the effect of a judgment and injunction against the state itself. 521 U.S. at 270. The Court in both cases rejected the idea that "empty formalism" and "elementary mechanics of captions and pleading" determined whether a case was a personal or official capacity action. *Kentucky*, 473 U.S. at 169; *Coeur*

*d'Alene*, 521 U.S. at 270; *see also Alden*, 527 U.S. at 757. Instead, the Court looks at the effect of the relief sought.

Here, it is immediately apparent that this case is a case against Defendant Kuhn personally. The suit was filed after Defendant left his position at Radford; the suit named Defendant specifically and he was never substituted; Radford never litigated this case on behalf of Defendant; Defendant accepted service and has been litigating this case himself; and the parties have treated Radford as a third party (not a party to the case). Accordingly, the case should proceed against Defendant personally.

This case was filed on April 12, 2023, naming Mr. Kuhn as the Defendant and seeking monetary damages from him (as opposed to merely injunctive relief) as is consistent with a personal capacity claim for relief. ECF No. 1; Exhibit M. The suit was filed approximately ten months after Defendant Kuhn left his position at Radford (i.e. it was filed against him while we was a *former employee* of Radford). *Id.* If Mr. Peyton sued Defendant Kuhn merely as the nominal officeholder of the office of head baseball coach at Radford, the case would have been a nullity the instant it was filed, because a plaintiff cannot sue a former employee in their "official capacity." *See, e.g., Stewart v. Nottoway Cnty.*, 684 F. Supp. 3d 467, 477 (E.D. Va. 2023) ("because Tucker and Page no longer serve as Board members, Plaintiff cannot maintain an official-capacity claim against them"). Alternatively, when the instant the case was filed, Defendant Kuhn would have been substituted for the current head baseball coach. See Fed. R. Civ. P. 25(d) (providing that when a public official sued in his official capacity leaves office, "[t]he officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name…"). But that is not how the Parties or the Court treated the pleadings in this case—Defendant Kuhn still used his own name and so did Mr. Peyton and the Court.

The problems continue upon a closer inspection. Were Radford University (an agency of the Commonwealth) the true "party at interest," Radford would have needed to "receive[] notice and an

opportunity to respond" through service of process and an opportunity to answer the complaint, asserting defenses. *See Kentucky*, 473 U.S. at 166. Instead, the docket in this case reflects that Defendant Kuhn was served with process personally out of state after he left his employment at Radford. ECF No. 3. Further, Defendant Kuhn is represented by private counsel, not the Attorney General's Office for the Commonwealth.

The Parties have also both treated Radford University as a represented nonparty rather than the true defendant. For example, both Parties served subpoenas to produce documents on Radford in discovery, a process that would have been entirely unnecessary if Radford was the true defendant and could have received requests for production of documents under Federal Rule of Civil Procedure 34.

Accordingly, despite the errant references to his "official capacity" in the caption and paragraph 10 of the complaint (*see* ECF No. 17 at 1 (caption); ¶ 10 (saying only that Defendant Kuhn acted in his official capacity as baseball coach when he inflicted the injury)),[3] this case has always been litigated as a personal capacity suit. Just as in *Kentucky*, this case was "necessarily litigated as [solely] a personal-capacity action" even though the complaint contained errant official capacity language. 473 U.S. at 168. Like in *Kentucky*, "the [Supreme] Court's Eleventh Amendment decisions require[] this case to be litigated as a personal-capacity action." The Court should reject the assertion of sovereign immunity.

---

[3] Mr. Peyton acknowledges the misuse of the phrase "official capacity" by his prior counsel in these sections of the Complaint. What prior counsel was trying to convey – and this is made clear through a holistic reading of the complaint – is that Kuhn harmed Peyton when Kuhn was acting within the scope of his employment. He was not trying to sue Kuhn solely as the officeholder of "head baseball coach" at Radford almost a year after he knew Kuhn had left that position.

**B. Even if this case is an "official capacity" case, Defendant waived sovereign immunity by waiting until the eleventh hour to assert it.**

Even if the Court finds that Radford is the true defendant, sovereign immunity was waived by the litigation conduct here.[4] Unlike subject-matter jurisdiction, sovereign immunity may be forfeited by a state's voluntary decision to engage in federal litigation without asserting immunity as a threshold defense. *Nair.*, 443 F.3d at 476. As *Nair* explained, "[where] a State refuses to invoke its sovereign immunity as a threshold defense, usually by way of a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, it cannot credibly be heard to complain about the indignity of the federal courts resolving the merits of its case." *Id.; see also Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 618-619 (2002) (holding a state waives Eleventh Amendment immunity by removing a case to federal court, thereby invoking the jurisdiction of the federal courts).

A District of Maryland case held that State defendants "waived their sovereign immunity defenses by waiting over two years to assert it." *Brown v. Dep't of Pub. Safety & Corr. Servs.,* 383 F. Supp. 3d 519, 553 (D. Md. 2019). The court there also discussed that a refusal to assert sovereign immunity can sometimes be a "tactical decision" that likewise results in waiver. *Id.* (citing *Barachkov v. Davis*, 580 Fed. App'x 288, 299 (6th Cir. 2014)). The *Brown* court collected cases from across the Nation where, as here, defendants actively participated in preparing a case for trial just to assert sovereign immunity as a defense on the eve of trial. *See Brown*, 383 F. Supp. 3d at 553 (collecting cases). Just as in *Brown*, the Court here should rule this defense (and immunity) waived.

Waiting until the eve of trial is particularly problematic because sovereign immunity, while waivable, is not merely a defense to liability but an immunity from suit in the first place. *Puerto Rico*

---

[4] *See Brown v. Dep't of Pub. Safety & Corr. Servs.,* 383 F. Supp. 3d 519, 553 (D. Md. 2019) (citing *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 491 (4th Cir. 2005)); *Nair v. Oakland Cnty. Cmty. Mental Health Auth.*, 443 F.3d 469, 476 (6th Cir. 2006).

*Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993). As merely a descriptive matter, Defendant Kuhn has already mostly waived sovereign immunity because he has voluntarily submitted to the federal court's jurisdiction through a motion to dismiss (where Defendant Kuhn strategically chose not to raise the defense) and full discovery. So, as a normative matter, he should not be able to pull the proverbial plug on the litigation now once it reaches its conclusion, when he could have done so every day from the case's inception.

This case makes plain "the unfairness that results whenever a state is allowed to 'test the waters' of a plaintiff's claim before deciding whether to assert immunity against those claims or defend them on the merits." *Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine*, 486 F. Supp. 3d 1173, 1188 (S.D. Ohio 2020) (citing *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 394-95 (1998) (Kennedy, J., concurring)). Defendant Kuhn could have asserted sovereign immunity any time throughout this litigation. He chose not to raise it in either iteration of his motion to dismiss, and chose instead to submit to the Court's jurisdiction through discovery. He cannot now change course, claiming that the Court never had jurisdiction over him. The Court should find waiver if it even finds that sovereign immunity applies in the first place.

### C. Even if Kuhn did not waive sovereign immunity, there are elements of prospective relief that survive under Ex parte Young.

Even if the Court finds Defendant Kuhn has not waived sovereign immunity, the Court still must deny the motion because some of the declaratory and injunctive relief requested is prospective and therefore survives under *Ex parte Young*. As is well established under the *Ex parte Young* doctrine, "the Eleventh Amendment does not preclude private individuals from bringing suit against State officials for prospective injunctive or declaratory relief designed to remedy ongoing violations of federal law." *Bragg v. W. Virginia Coal Ass'n*, 248 F.3d 275, 292 (4th Cir. 2001) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

Here, Mr. Peyton sought both declaratory and injunctive relief. *See* ECF No. 17 ¶ 88. Specifically, he sought a declaration that "Kuhn violated [his] … rights," and he sought injunctive relief in the form of a court order "ordering Kuhn to undergo First Amendment training…, and to take no adverse action against Peyton based on any exercise of his First Amendment rights."[5] *Id.* Under established Fourth Circuit precedent, this relief is prospective and survives under *Ex parte Young*. *See Talley v. Folwell*, 133 F.4th 289, 298 (4th Cir. 2025) ("Under the *Ex parte Young* exception, private citizens may petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution").

Defendant makes at least two fatal errors arguing to the contrary. First, and most clearly, he completely fails to address the declaratory relief sought. ECF No. 47 at 8-10. While Defendant titles two of his sections some form of "Peyton is not entitled to declaratory or injunctive relief," he never actually addresses why the declaratory relief sought is not prospective. *Id.* His failure to challenge the declaratory relief results in a waiver of that argument and the Court need not consider any such argument in a reply brief. *M.B. v. Fairfax Cnty. Sch. Bd.*, 660 F. Supp. 3d 508, 526 (E.D. Va. 2023) (citing *United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006) ("it is well-established that an argument raised for the first time in a reply brief is waived and will not be considered.")). Because Kuhn fails to address the declaratory relief sought, at least that relief survives summary judgment.

Defendant commits his second error when he reduces the requested injunctive relief to only apply to him personally while claiming at the same time that he was only sued in his official capacity. ECF No. 47 at 9 (arguing Mr. Peyton's injunctive relief against him fails because he "no longer serves as the school's head baseball coach"). But Kuhn cannot have it both ways – either the claim, and the

---

[5] Mr. Peyton concedes that the relief related to his NCAA petition is moot.

relief, is against him personally or it is not. If the claim is really against the office of head baseball coach, an injunction against the office (Defendant in his official capacity) would be irrelevant to whether he personally still works at Radford. This is because an official capacity claim is "*not* a suit against the official personally, for the real party in interest is the entity." *Kentucky*, 473 U.S. at 166 (emphasis in original). Therefore, any injunctive relief would run against the office at Radford and would have nothing to do with Defendant's personal employment at Radford. Defendant's conclusions (namely, that relief would run against him personally even when liability does not) rest on a misunderstanding of official capacity claims and they therefore fail.[6] *See Kentucky*, 473 U.S. at 165 ("liability on the merits and [relief] go[es] hand in hand").

Moreover, and again construing the claim as against the Radford office, ultimately what Mr. Peyton seeks is an injunction prohibiting the Radford office (or Defendant personally, if a personal capacity case) from taking any further action against him in violation of the First Amendment. ECF No. 17 ¶ 88 ("a permanent injunction ordering Kuhn to … take no adverse action against Peyton based on any exercise of his First Amendment rights"). Courts in the Fourth Circuit have found similar injunctions to be squarely within the bounds of *Ex parte Young*.[7] In light of these cases, Defendant cannot maintain his argument that this very type of prospective injunctive relief is moot or that Mr. Peyton lacks standing. Like his other sovereign immunity arguments, this one fails.

---

[6] This necessarily follows if the Court construes the claim as against Kuhn in his official capacity and not against Kuhn personally. But as set forth in Section I(a), Mr. Peyton intended to sue Kuhn personally and so the Court need not engage in this analysis.

[7] *See*, *e.g.*, *Bradley v. N. Carolina Dep't of Transp., Div. of Motor Vehicles*, 286 F. Supp. 2d 697, 702 (W.D.N.C. 2003) (holding that an injunction prohibiting further "discrimination and retaliation" fell within the scope of the *Ex parte Young* exception); *Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 165 (4th Cir. 2023) (holding that an injunction fell within *Ex parte Young* where the plaintiff sought "relief that would prohibit Defendants from any *additional* or *future* allegedly unlawful actions") (emphasis in original).

## II. There are Genuine Issues of Disputed Material Facts as to Whether Defendant Retaliated Against Mr. Peyton for Exercising his First Amendment Rights.

Mr. Peyton alleges two retaliatory acts in his Amended Complaint: (1) Defendant inserted Mr. Peyton in the game on April 23, 2021, burning his redshirt, and therefore costing him a year of eligibility and (2) Defendant cut Mr. Peyton from the team. First Amendment retaliation claims involve three elements. *Peyton v. Kuhn*, No. 7:23-cv-209, 2023 WL 8374930, at *2 (W.D. Va. Dec. 4, 2023) (quoting *Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017) (quotation marks omitted)); *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020) (importing the pleading standard test at summary judgment). Accordingly, Mr. Peyton will need to prove: "(1) Peyton 'engaged in protected First Amendment activity'; (2) Kuhn 'took some action that adversely affected [Peyton's] First Amendment rights'; and (3) 'there was a causal relationship between [Peyton's] protected activity and [Kuhn's] conduct.'" *Peyton*, 2023 WL 8374930, at *2 (quoting *Buxton v. Kurtinitis*, 862 F.3d 423, 427 (4th Cir. 2017)). At summary judgment, Defendant only challenges the third element: the causal relationship between the protected activity and Defendant's conduct.

"To demonstrate a causal relationship between protected activity and the defendants' conduct, this Court applies the burden-shifting framework of the same-decision test." *Shaw v. Foreman*, 59 F.4th 121, 130 (4th Cir. 2023) (citing *Martin v. Duffy*, 977 F.3d 294, 299 (4th Cir. 2020)). Once a plaintiff establishes a prima facie case of causation, the burden shifts to the defendant to prove they would have taken the same action in the absence of the protected activity. *Id.* "For a plaintiff to meet his prima facie burden of causation, he must show '(1) that the defendant [was] aware of [his] engaging in protected activity' and (2) 'some degree of temporal proximity to suggest a causal connection.'" *Shaw*, 59 F.4th at 130–31 (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005)). Here, a reasonable jury could find that Defendant Kuhn retaliated against him both by playing him in the game and then again by cutting him from the team.

### A. Defendant retaliated against Mr. Peyton by playing him in the game.

The evidence shows that following a history of racial epithets and differential treatment of players, Mr. Peyton approached Defendant about his mental health. Mr. Peyton reported Defendant's response, about cutting his head off with scissors, to Ms. McCoy. Exhibit A at 31:13–33:1; Exhibit E at 16:12–17:11. Defendant immediately became aware that Mr. Peyton reported this comment and excluded him from team activities. Exhibit A at 31:14–33:1, 34:18–35:2. Still, in March 2021, Mr. Peyton attempted once more to obtain playing time. *Id.* at 66:2–19. In response, Defendant told Mr. Peyton he was not on the active roster. *Id.* This solidified that Mr. Peyton would be taking a redshirt that season.

On April 21, 2021, Mr. Peyton, with twelve other players, went back to the Radford administration to complain about Defendant's abuse. Exhibit C at 23:4–16; 42:1–14. Defendant was aware of this meeting and viewed Mr. Peyton as "one of the main figures" of the student meeting. Exhibit B at 47:17–21; Exhibit E at 30:21–32:5. Just two days later, on April 23, 2021, Defendant played Mr. Peyton for just half a game with just weeks left in the season. Exhibit B at 17:16–24, 28:19–25. Defendant knew this could eliminate Mr. Peyton's ability to redshirt. *Id.* at 27:18–28:3.

Defendant could have played two other players, yet chose to play Mr. Peyton. In doing so, Defendant played Mr. Peyton out of position at third base—Mr. Peyton exclusively played second base and short stop. Exhibit A at 11:9–12. Playing him out of position shows that his intention was to play him for the sake of playing him and therefore cost him his redshirt. As a head coach, Defendant knew all consequences of playing a player who was planning to redshirt. Exhibit B at 27:18–28:3.

In light of these facts, Mr. Peyton easily meets his burden in making a prima facie case of causation. Defendant was aware that Mr. Peyton was in the thirteen-player meeting and viewed him as the leader of the meeting. And, just two days after the meeting, Defendant played Mr. Peyton for the first time all season, with just weeks to go. Defendant knew Mr. Peyton intended to redshirt, and

he knew the implications of playing Mr. Peyton. Still, Defendant played Mr. Peyton out of position, in place of others who could have played instead. But for the thirteen-player meeting, Defendant would not have played Mr. Peyton in the game, burning his redshirt.

Here, the temporal proximity of Mr. Peyton's complaint and the retaliatory actions by Defendant create a genuine issue of material fact. In *Flanagan v. Scearce*, this District found "that the temporal proximity of [Plaintiff]'s speech on August 15, 2018, and her termination on August 30, 2018, is sufficient to create a genuine issue of material fact as to whether [her] speech was the but-for cause of her termination." No. 7:19-cv-00413, 2021 WL 4312555, at *8 (W.D. Va. Sept. 22, 2021). Therefore, "[a] reasonable juror could conclude, from the short two-week interval between [Plaintiff]'s speech and her termination, that [Defendant] and the board fired [her] in retaliation for these public comments." *Id.* "Put simply, although a reasonable jury could conclude that [Defendant] would have fired her anyway, it could also reach the opposite conclusion." *Id. See also Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 656 (4th Cir. 2017) ("In retaliation cases, a causal connection may exist where the employer takes adverse employment action against an employee shortly after learning of the protected activity."). The same is true here, but the temporal proximity is even closer. Mr. Peyton complained about Defendant's conduct, and just two days later Defendant played Mr. Peyton to intentionally burn his redshirt. A reasonable jury could infer a causal connection from this two-day temporal proximity.

Defendant's arguments that any retaliatory motive was not the but for cause for playing Mr. Peyton fail. And, regardless, his protestations otherwise only go to show a genuine issue of material fact. Defendant argues Mr. Peyton knew if he remained on the team, that he would be subject to playing. ECF 47 at 11. As the evidence illustrates, however, Defendant and Mr. Peyton had an understanding that he would redshirt that season. Exhibit A at 34:18–35:2. Defendant also told Mr. Peyton he was not on the active roster. *Id.* at 66:2–19. Moreover, Ms. McCoy testified it is common

for players to redshirt and remain on the team. Exhibit E at 53:8–11. Thus, the fact that Mr. Peyton remained on the team does not negate Defendant's retaliatory motive – that fact simply has nothing to do with the retaliation of burning the redshirt. Defendant also argues Mr. Peyton had to play due to injuries and other factors. ECF 47 at 12. Two other players, however, could have played third base instead, and third base was not even Mr. Peyton's position. Exhibit B at 70:18–72:5; Exhibit A at 11:9–12. There was no need to play Mr. Peyton in the game, especially out of position, however, Defendant did so to burn his redshirt and punish him.

In sum, Mr. Peyton was going to redshirt during the 2021 baseball season. This was known to Defendant. But as soon as Mr. Peyton, in Defendant's mind, led a thirteen-player meeting to complain about Defendant, Defendant played him for the first time all season, with just weeks to go, out of position, and burned Mr. Peyton's redshirt. A reasonable jury could find that this was retaliation for Mr. Peyton's protected complaints.

**B. Defendant retaliated against Mr. Peyton by cutting him from the team.**

Just days after Defendant played Mr. Peyton in a game to burn his redshirt, Defendant cut him from the team. Again, as in *Flanagan*, this awareness and temporal proximity could allow a reasonable jury to conclude retaliation was the but for cause for Defendant cutting Mr. Peyton from the team. 2021 WL 4312555, at *8. Defendant makes several arguments for the conclusion that him cutting Mr. Peyton was not retaliatory, but these arguments only hurt Defendant's position because they merely serve to highlight disputed material facts. Such arguments are also not supported by caselaw. His motion should be denied,

Defendant first argues other players in the meeting remained starters, so it was not retaliation against Mr. Peyton. ECF 47 at 12. In *Hening v. Adair*, 644 F. Supp. 3d 203 (W.D. Va. 2022), the defendant made a similar argument that this District rejected. In *Hening*, the plaintiff along with two or three other players, declined to kneel for the national anthem in support of a social justice protest.

644 F. Supp. 3d at 213. The defendant then gave the plaintiff significantly less playing time but did not take any action against the other players. *Id.* The court found that the defendant could introduce this evidence at trial to show his actions against the plaintiff were non-retaliatory, however, at summary judgment "these additional facts and attendant inferences in favor [of the defendant] do not vitiate the genuine questions of material fact" the plaintiff established to support her claims. *Id.* (quoting *Barnett v. Roanoke Cnty. Sch. Bd.,* No. 7:20-cv-00663, 2021 WL 5611317, at *12 (W.D. Va. Nov. 30, 2021)). "[Once] a plaintiff offers circumstantial evidence of a discriminatory motive, 'the case must be decided by the trier of fact and cannot be resolved on summary judgment.'" *Id.* (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019)).

Additionally, because Defendant viewed Mr. Peyton as the ringleader, it is reasonable that he may have just punished the leader to silence the other members of the team. In other words, he did not need to punish all of the players so long as he punished their leader to cause a chilling effect. Defendant also could not cut all thirteen players for practical reasons; namely, that doing so would cause Radford to struggle to field a full team. Furthermore, the two players who remained on the team the following year that were in the meeting lost playing time and felt there was a grudge against them. Exhibit C at 30:1–14. Thus, just because Defendant's ire was focused on Mr. Peyton and not the other players who likewise complained, does not defeat Mr. Peyton's argument that Defendant's actions towards him were retaliatory.

Defendant also argues that because he cut other players, his conduct was not retaliatory against Mr. Peyton. ECF 47 at 12. Both of the additional players identified as being cut in discovery, however, were also in that meeting. Exhibit N; Exhibit A at 47:14–15. Therefore, it could very well be the case that Defendant also retaliated against those players.

Defendant also unconvincingly argues that cutting Mr. Peyton was a cost saving mechanism. ECF 47 at 12. As Mr. Lineburg testified, however, Radford historically never cut players prior to the

season ending. Exhibit D at 33:18–25. Thus, this irregularity cuts in favor of it being motivated by retaliation. And, contrary to this argument, Defendant immediately added two new players from Radford's club baseball team, which Mr. Lineburg found "unusual." *Id.* at 34:1–10. Thus, any cost saving was immediately reversed by the addition of two more players.

Perhaps most notably, Mr. Lineburg, Radford's Athletic Director, left open the possibility that Defendant cutting Mr. Peyton from the team could have been retaliation. *Id.* at 41:2–4. If Radford's Athletic Director viewed Defendant cutting Mr. Peyton as potential retaliation, then a jury could certainly find that Defendant retaliated against Mr. Peyton by cutting him from the team.

Lastly, mitigating any of Defendant's arguments that cutting Mr. Peyton from the team was not retaliatory is that Mr. Peyton could have legitimately contributed to the Radford baseball team. In *Hening*, the court found persuasive that the plaintiff was a "stalwart" on the team, so her benching could be retaliatory. 644 F. Supp. 3d at 213. Similarly, here, Mr. Peyton's status as a highly sought-after recruit and subsequent achievements likewise illustrates that but for Defendant's retaliatory conduct, Mr. Peyton could have succeeded on the Radford baseball team and would not have been cut. Indeed, Mr. Peyton obtained a scholarship from Towson, played baseball there for four years, and now plays professionally. Exhibit A at 53:1–15, 54:1–23, 62:22–63:6. Even in the one game in which Mr. Peyton played, he played considerably well. Exhibit J.

Genuine disputes of material fact exist as to whether Defendant would have cut Mr. Peyton but for a retaliatory motive, preventing summary judgment. Together, the timing of the meeting, Defendant then playing Mr. Peyton to burn his redshirt, and then cutting him from the team, illustrates Defendant's retaliatory intent that a reasonable jury could find. Defendant's motion should be denied.

**CONCLUSION**

For all of the above reasons, the Court should deny Defendant's Motion in its entirety.

Dated: November 13, 2025

Respectfully submitted,

*/s/ Benjamin F. North*

Lindsay R. McKasson, VSB No. 96074
Benjamin F. North, VSB No. 97439
Jared J. Roberts, VSB No. 97192
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
lindsay@binnall.com
ben@binnall.com
jared@binnall.com

Aaron B. Houchens, VSB No. 80489
AARON B. HOUCHENS, P.C.
111 East Main Street
P.O. Box 1250
Salem, Virginia 24153
Phone: 540-389-4498
aaron@houchenslaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on November 13, 2025, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to the following counsel of record.

Jim H. Guynn, Jr. (VSB No. 22299)
Matthew J. Schmitt (VSB No. 96513)
GUYNN WADDELL, P.C.
415 S. College Avenue
Salem, Virginia 24153
JimG@guynnwaddell.com
MattS@guynnwaddell.com

*Counsel for Defendant*

*/s/ Benjamin F. North*
Benjamin F. North

*Counsel for Plaintiff*